UNITED STATES DISTRICT COURT
DISTRICT OF RHODE ISLAND

VINCENT SANDONATO

    v.                                                                       C.A. No. 07-451S

DAYS INN WORLDWIDE, INC., and
CENDANT HOTEL GROUP, INC.

**REPORT AND RECOMMENDATION**

Lincoln D. Almond, United States Magistrate Judge.

      This matter is before the Court on the Motion for Summary Judgment (Document No. 53) filed by Defendant Days Inns Worldwide, Inc. (hereinafter "Defendant" or "Days Inn"). Days Inn moves defensively for judgment in its favor on all counts of Plaintiff's Complaint (Document No. 1), as well as offensively on all seven claims in its Second Amended Counterclaim. (Document No. 42). Defendant Cendant Hotel Group, Inc.,[1] the parent of Days Inn, was dropped from the lawsuit by agreement of the parties before this Court on June 2, 2010. The Motion for Summary Judgment has been referred to me for preliminary review, findings and recommended disposition. See 28 U.S.C. § 636(b)(1)(B); LR Cv 72. After hearing arguments, reading the parties' memoranda and considering relevant legal precedent, I recommend that Defendant's Motion be granted in part and denied in part, as explained below.

    **Facts**

      On January 5, 2006, Plaintiff Vincent Sandonato entered into a franchise agreement with Days Inn pursuant to which he converted the Royal Plaza Hotel, a 134-room hotel that he owned and operated at 425 East Main Road in Middletown, Rhode Island, to a "Days Inn guest lodging facility"

---

[1] Cendant Hotel Group, Inc., is now known as Wyndham Worldwide Corporation.

(hereinafter the "Hotel"). The franchise agreement is entitled "License Agreement." (Document No. 55-2). Stapled to the License Agreement, and incorporated as part of the Agreement, are the following additional documents: Appendix A, which consists of definitions of the License Agreement's terms; Schedule A, the Warranty Deed for the Hotel; Schedule B, the so-called "Punchlist," prepared by Defendant, which describes the property, as of May 3, 2005, and revised December 8, 2005, and lists changes and improvements that Plaintiff was to make on the property; and Schedule C, which sets forth fees, charges and assessments that Days Inn intended to charge Plaintiff during the fifteen-year term of the License Agreement. These pages are followed by an additional signature page, executed by Plaintiff and a Days Inn Vice President, dated January 5, 2006 and witnessed. The License Agreement is also initialed by Plaintiff, with the initials "VS," on pages 9, 14, 20, 21 and 22. In addition, the Punchlist is signed by Plaintiff, and all of its eight pages are either signed or initialed by Plaintiff. The parties agree that Plaintiff reviewed these documents along with his lawyer, and signed them in his lawyer's presence. Prior to the execution of the License Agreement, there had been a period of deliberation on the part of Plaintiff, as well as a period of negotiations over the Agreement's terms, during which time the parties agree Plaintiff consulted his attorney. Plaintiff asserts that promises and representations were made to him by Days Inn representatives during this period which were not incorporated into the final written License Agreement. These representations concerned Plaintiff's ability to terminate the franchise agreement without penalty within the first three years. In addition, Plaintiff asserts that representations were made to him about the required upgrades and renovations that are not reflected in the Punchlist or other documents.

Also on January 5, 2006, the parties executed a Satellite Connectivity Services Addendum. (Document No. 55-11). This agreement covers the terms and charges associated with telecommunications equipment to be installed at the Hotel, and related services to be provided by Days Inn personnel, in order to enable the Hotel to be connected via the Internet to the hotel chain's centralized reservation system, or "CRS." The CRS allows prospective guests to book rooms at the Hotel, through a Days Inn website or toll-free telephone number, from almost anywhere in the world. Under Section 13(b), the Satellite Connectivity Services Addendum set forth Defendant's right to repossess the telecommunications equipment after the termination of the License Agreement.

The Hotel opened as a Days Inn at the beginning of March 2006. According to Defendant's Statement of Undisputed Material Facts (Document No. 55), which were not refuted by Plaintiff, the Hotel's front desk clerk, Tiffanie Clauer-Janelle, testified at her deposition that, from the start, Plaintiff did not want to make some of the alterations included in the Punchlist, such as replacing marble sinks, replacing the showerheads, replacing the televisions sets with larger ones, changing the wallpaper and putting coffee pots in the guestrooms.

**The Inspections**

In November 2006, October 2007 and June 2007, Days Inn personnel visited and inspected the Hotel, all three times giving it a failing grade[2] on the "Days Inn Quality Assurance Evaluation & Improvement Plan" reports (Document Nos. 55-5, 55-6 and 55-7). In his Statement of Undisputed Material Facts (Document No. 64), Plaintiff asserts that his failure to make alterations, requested by Defendant but not included in the original Punchlist, "in part" caused the Hotel's failing

---

[2] The higher the score, the worse the evaluation. A score over 400 is considered failing. The Hotel received a 482 in November 2006, a 519 in June 2007, and a 988 in October 2007.

inspection scores. The November 2006 inspection report (Document No. 55-6) indicates that, among other infractions, the guest rooms were dirty, paint was peeling, sinks were scratched, ceilings were mildewed, the bathroom fixtures were rusty and otherwise "non-compliant," Days Inn promotional materials and signage were missing, and some items still bore the Royal Plaza Hotel marks. No points were assessed for the non-compliant bathroom fixtures, as those items were reportedly "on order." On a sheet in the report labeled "Punchlist Follow Up Evaluation Page," eleven items are listed as 255 days overdue from the original May 3, 2005, Punchlist date, including, among other items, "Replace windows where seals are broken," "Replace vanities/sinks where cracked," and "Replace/install/apply wallcovering in guestrms/bathrooms." Following this inspection, Days Inn sent Plaintiff a default notice, requiring him to bring the Hotel up to Days Inn's "quality assurance standards" by the next inspection.

The June 15, 2007 inspection was unannounced. The Hotel again failed, with a worse score than the previous November (Document No. 55-7). Some improvements were noted, such as the installation of new shower heads and rods "per the Days Inn standard," and the replacement of several windows; however, the guestrooms were still reported to be dusty and dirty. A dispute was noted between the inspector and the Hotel's general manager, Christal Clauer, over the wall coverings. While the Days Inn inspector claimed that the chain required vinyl wallpaper in the guestrooms, Christal Clauer told him that the painted walls had been previously approved by Days Inn personnel at the time of the conversion.[3] The inspector also noted that the bedspreads were incorrectly turned down, and that pillows were "Inadequate number, Non-compliant." Sinks were

---

[3] The Punchlist notes that "Flat finished walls in the meeting room are acceptable if condition is maintained." However, in the section labeled "Guestrooms," the Punchlist states, "Replace/install/apply wallcovering to include bathrooms." In the section of the Punchlist labeled "Public Areas," the Punchlist states, "Complete replacement/installation of new wallcovering in corridors and stairwells."

again found to be scratched, faucets rusty and tarnished and furniture worn. As for the "Punchlist Follow Up Evaluation Page," the same eleven items are listed, but six are designated as "Complete." The swimming pool remained unbuilt, still awaiting approval from the city. However, no demerits were assessed for this. The remaining four items, noted as 472 days overdue, included: "Replace vanity/sink in Men's public restroom," "Complete replacement/installation of new wallcovering in co,"[4] "Replace/install/apply wallcovering in guestrms/bathrooms," and "Replace vanities/sinks where cracked."

On June 20, 2007, Days Inn sent Plaintiff a letter notifying him that he was delinquent of his monetary obligations under the License Agreement in the amount of $22,486.27. (Document No. 55-8). The letter was structured as an agreement, by which Plaintiff agreed to a payment plan. It was signed by general manager Christal Clauer.

After the second inspection, Days Inn also sent Plaintiff a "Notice of Continuing Quality Assurance Default," dated July 26, 2007. (Document No. 64-2). The letter referenced an earlier quality assurance default notice that had been sent to Plaintiff on December 18, 2006. The July letter informed Plaintiff that certain of his franchise fees were to be increased due to his continued default. The letter also notified Plaintiff that his failure to cure his default allowed Days Inn to terminate the License Agreement, but that it was giving him an additional sixty days to cure the Hotel's quality assurance deficiencies. This was described as "a final opportunity to avoid termination." In addition, the letter threatened that, if Plaintiff did not work out an improvement plan with them by August 2, 2007, the Hotel's access to the central reservation system, the CRS, could be suspended.

---

[4] I assume 'co' is the abbreviation for corridor because it is coded as "Public Area, Interior."

The third inspection report before the Court is dated October 2007. As with the prior inspections, the poorest score is in the area of "Compliance." Cleanliness is still an issue, and the inadequate number of pillows and non-compliant bed turn-down procedure are again noted. The guestroom televisions are marked as non-compliant, "NO-HBO," along with broken remote controls. A five-page "Severe Item Follow Up Evaluation Page" lists dozens of separate items cited in the two prior inspections that remain uncorrected and not in compliance with Days Inn standards. Finally, the "Punchlist Follow Up Evaluation Page" notes the same four non-compliant areas as before: cracked sinks in guestrooms and public areas and improper wall treatments in the guestrooms, bathrooms and public areas.

During 2007, the Hotel purchased new mattresses, box springs, pillows, bedspreads, pillow cases and pillow covers, for a total expenditure of $74,517.00. This purchase was either made by SAVI International Corporation ("SAVI"), Plaintiff's wholly-owned operating company, or by Plaintiff himself. Plaintiff asserts that Defendant required this bedding, although it had not been included on the Punchlist, and that this requirement was a violation of the License Agreement.

**CRS Shutdowns**

During 2007, various penalties were imposed on Plaintiff's operation by Days Inn in an effort to compel Plaintiff to comply with its standards and to pay delinquent franchise fees. As mentioned above, in July 2007, Plaintiff's franchise fees were increased as a penalty for his failed inspections. In addition, at various times throughout 2007, the Hotel's access to Days Inn's CRS was restricted. The parties agree that the CRS was shut down by Days Inn to penalize Plaintiff during the following time periods: September 8 – September 29, 2006, and November 14, 2007 – April 24, 2008. There were possible additional periods of shutdown, including; May 31 – June 9,

2005; August 31 – December 13, 2006; March 27 – March 28, 2007; and May 11 – May 15, 2007. (Document No. 64-8).

Most significantly for our purposes, the CRS was again shut down during all or part of the period from mid-June 2007 through December 1, 2007. Both Plaintiff and Defendant initially agreed that this period of CRS shutdown was a penalty imposed on Plaintiff for his non-payment of franchise fees. However, in the course of this litigation, Defendant changed its position and now claims that CRS access had been shut off at the Hotel by one of Plaintiff's employees, perhaps inadvertently. (See Document No. 64-8, Defendant Days Inn Worldwide, Inc.'s Supplemental Answers to Plaintiff's First Set of Interrogatories). Defendant asserts that this shutdown was activated on October 20, 2006, for the period starting May 1, 2007 and continuing until August 21, 2007 (See Document No. 64-9). When Plaintiff investigated this allegation, also in the course of preparing for litigation, Plaintiff's expert concluded that Defendant's technical personnel shut down the Hotel's CRS access after being called in for assistance around October 20, 2006. (See Document No. 64-12).

This dispute is a key focus of the litigation because Plaintiff claims that the shutdown of the CRS during the peak summer season of 2007 had a major impact on the Hotel's revenues. According to Plaintiff, when a prospective guest would try to make a reservation on the Internet or through the 800 number, he or she would be notified that the Hotel had no rooms available. Consequently, the Hotel's CRS reservations plummeted from 2,429 in 2006 to 427 in 2007, causing an estimated loss of profits of over $125,000.00, according to Plaintiff's accounting expert. Document No. 64-13.

**Termination of License Agreement**

Plaintiff filed his Complaint on December 10, 2007. Subsequently, on April 24, 2008, Days Inn sent Plaintiff a letter stating that it had been notified that Plaintiff stopped operating the Hotel as a Days Inn and that, accordingly, the License Agreement was terminated. The letter requested that Plaintiff remove, disable and take down all Days Inn signs, listings, advertising, directories, etc., and that Plaintiff "perform all post-termination obligations specified in the Systems Standards Manual." Document No. 55-12. The letter also included a monetary demand for liquidated damages of $134,000.00, due to Plaintiff's premature termination of the License Agreement; for damages of $2,500.00 for early termination of the telecommunications equipment addendum; and for $97,840.23 in delinquent franchise fees.

According to the Satellite Connectivity Services Addendum, Plaintiff was required to return Days Inn's telecommunications equipment when the Licence Agreement was terminated, which Defendant asserts, and Plaintiff has not disputed, was April 24, 2008. As of May 7, 2008, the Hotel was operating again as the Royal Plaza Hotel. On that same date, Plaintiff's attorney wrote to Defendant's attorney stating that Plaintiff had "received another call" indicating that someone would be coming to the Hotel to pick up the equipment. (Document No. 55-13). The letter continued, "Please advise your client that this will not be allowed until my client is satisfied that removal will not interfere with the hotel's business." Ultimately, Defendant claims it was unable to recover the equipment until it obtained an Order from this Court dated November 14, 2008. (Document No. 27). That Order indicates that neither party waived its claim that it was entitled to retain the telecommunications equipment. Defendant ultimately took possession of the telecommunications equipment on November 26, 2008, twenty-nine weeks after the termination of the License Agreement.

**Standard of Review**

When ruling on a motion for summary judgment, the court must look to the record and view all the facts and inferences therefrom in the light most favorable to the nonmoving party. Cont'l Cas. Co. v, Canadian Univ. Ins. Co., 924 F.2d 370, 373 (1st Cir. 1991). Once this is done, Rule 56(c) requires that summary judgment be granted if there is no issue as to any material fact and the moving party is entitled to judgment as a matter of law. A material fact is one affecting the lawsuit's outcome. URI Cogeneration Partners, L.P. v. Bd. of Governors for Higher Educ., 915 F. Supp. 1267, 1279 (D.R.I. 1996). Factual disputes are genuine when, based on the evidence presented, a reasonable trier of fact could return a verdict for the nonmoving party. Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248 (1986). To win summary judgment on a particular count of the complaint, the moving party must show that "there is an absence of evidence to support" the non-moving party's claim. Celotex Corp. v. Catrett, 477 U.S. 317, 325 (1986). In response, the nonmoving party cannot rest on its pleadings, but must "set forth specific facts demonstrating that there is a genuine issue for trial" as to the claim that is the subject of the summary judgment motion. Oliver v. Digital Equip. Corp., 846 F.2d 103, 105 (1st Cir. 1988).

In our District, Local Rule Cv 56 requires that a Motion for Summary Judgment be accompanied by a Statement of Undisputed Facts, with each fact set forth in a numbered paragraph. The moving party's proffered Facts are deemed admitted unless the objecting party files a Statement of Disputed Facts, identifying the evidence establishing the dispute. See LR Cv 56(a)(3). In the present litigation, Defendant filed a Statement of Undisputed Facts. (Document No. 55). Plaintiff followed with his own Statement of Undisputed Facts (Document No. 64), numbered consecutively to Defendant's Facts, as required by LR Cv 56(a)(4). However, he did not file a Statement of

Disputed Facts and thus the facts in Defendant's Statement may be deemed admitted. Defendant responded to Plaintiff's filing, disputing some facts and admitting others, with a Statement of Disputed Facts with corresponding numbering as required by LR Cv 56(a)(5). As Plaintiff has never contested Defendant's Undisputed Facts, the Court has, for the most part, deemed those facts admitted.

**Analysis**

**Count 1**

In his Count 1, Plaintiff alleges that Defendant violated the Rhode Island Franchise Investment Act, R.I. Gen. Laws § 19-28.1-1, et seq. Among other things, this Act prohibits fraudulent or deceptive practices in connection with the sale of a franchise, including making untrue or misleading statements. See Guzman v. Jan-Pro Cleaning Sys., Inc., 839 A.2d 504 (R.I. 2003). Plaintiff alleges that he was unfamiliar with the franchising business and that he was induced to become a Days Inn franchisee by Defendant's representatives who told him that he would be able to terminate the franchise agreement without penalty.

**Standing**

Defendant mounts several arguments in response. One is that the Plaintiff lacks standing to bring this claim (as well as several other claims in the Complaint), because the Hotel was operated by a separate corporate entity, SAVI International, Inc., Plaintiff's solely-owned operating company. Defendant argues that the damages allegedly incurred by Plaintiff were actually incurred by SAVI, and that Plaintiff cannot establish that he suffered damages. However, standing is not an operative concept in the context of the present dispute. While damages are an essential element of a *prima facie* case in tort, quantified damages are not required in a contract case. According to the

Restatement (Second) of the Law of Contracts § 346 (1981), "a breach of contract by a party against whom it is enforceable always gives rise to a claim for damages." Even if the breach of contract caused no loss, a claimant may be awarded nominal damages. See Gallagher v. Poignies, 79 R.I. 423, 428 (1952); The Parking Co., L.P., v. Rhode Island Airport Corp. v. New England Parking Co., L.P., 2005 WL 419827 (R.I. Super. 2005); Nappe v. Anschelewitz, Barr, et al., 477 A.2d 1224, 1228 (N.J. 1984). Plaintiff signed the License Agreement, and he has standing to claim that it was breached, whether he personally suffered demonstrable damages or not. It follows therefrom that, because Plaintiff signed the franchise agreement, he is the franchisee and has standing to claim a violation of the Franchise Act. R.I. Gen. Laws § 19-28.1-3(8).

While standing is a "red herring," Defendant's argument based on the plain language of the License Agreement is persuasive. The License Agreement states clearly in several places that it reflects the complete agreement between the parties. For example, in Section 17.7.2, the Agreement states in bold-faced print:

> Neither we nor any person acting on our behalf has made any oral or written representation or promise to you on which you are relying to enter into this Agreement that is not written in this Agreement. You release any claim against us or our agents based on any oral or written representation or promise not stated in this Agreement.

The next section continues, also in bold-face print: "17.7.3 This Agreement, together with the exhibits and schedules attached, is the entire agreement superseding all previous oral and written representations, agreements and understandings of the parties about the Facility and the License." Similar warnings, or so-called integration clauses, appear in Section 14.3. Moreover, the License Agreement clearly states in Section 5 that its term is fifteen years, and, in Section 12.1, that liquidated damages will be charged if the Agreement is terminated prior to the end of the term. Both

pages with these provisions are initialed by Plaintiff. It is undisputed that Plaintiff was represented by counsel throughout the negotiation process, up to and including his execution of the License Agreement, and there is absolutely no ambiguity in the relevant contract language discussed above. Consequently, his attestations that he was the victim of fraudulent misrepresentations are simply not colorable, and I recommend that summary judgment be GRANTED in Defendant's favor on Count 1.

**Counts 2 and 3**

Plaintiff claimed that the liquidated damages clause of the License Agreement was unconscionable (Count 2) and that the Agreement should be reformed, based on the parties' mutual mistake, to reflect the parties' verbal agreement that it could be terminated without penalty (Count 3). However, at oral argument before this Court on June 2, 2010, Plaintiff abandoned these claims and agreed to the dismissal of Counts 2 and 3.

**Count 4**

In Count 4, Plaintiff alleges that Defendant breached the License Agreement by restricting the Hotel's use of the CRS from May 1, 2007, through August 21, 2007. Defendant again makes the argument that Plaintiff lacks standing to make a claim for breach of contract because Plaintiff's operating company, SAVI, incurred the alleged damages. As the Court explained in connection with Count 1, this argument is unavailing because, as the signatory to the License Agreement, Plaintiff may sue for its breach. Defendant's other argument is that Plaintiff or his agents were the ones responsible for disconnecting the CRS during the pertinent time period.

It is plainly apparent that the CRS is an important tool to boost bookings at a Days Inn guest lodging facility and that access to the CRS was a material term of the License Agreement. In

Section 4.2, the License Agreement provides, "**Reservation System.** We will operate and maintain (directly or by subcontracting with an affiliate or one or more third parties) a computerized Reservation System or such technological substitute(s) as we determine, in our discretion."

While Defendant could argue that it was its prerogative to restrict Plaintiff's access to the CRS based on Plaintiff's defaults, instead Defendant has argued that it did not restrict Plaintiff's access during the pertinent time period and that Plaintiff inadvertently did so. Plaintiff insists that the restriction was put in place by Defendant or its agents. This creates a dispute over a material fact concerning an essential element of the contract. The questions of which party is responsible for the restriction of access to the CRS, and whether or not such a restriction constitutes a material breach of the License Agreement are issues of fact, ordinarily submitted to a jury. Magnet Res. v. Summit MRI, Inc., 723 A.2d 976, 982 (N.J. Super. A.D. 1998). Consequently, the Court recommends that Defendant's Motion for Summary Judgment on Count 4 be DENIED.

**Count 5**

Plaintiff's second breach of contract claim alleges that Defendant used the threat of declaring him in breach of the License Agreement to compel him to spend significant sums of money to make changes at the Hotel that were not included on the Punchlist or that Defendant had previously agreed to waive. Plaintiff describes the License Agreement as prohibiting Defendant from requiring any upgrades that are not on the Punchlist for the first three years of the Agreement's term, and limiting subsequent upgrades to "minor renovations." In his Opposition to Defendant's Motion for Summary Judgment (Document No. 63), Plaintiff focuses on the approximately $75,000.00 expenditure he or SAVI made for king-size mattresses, box springs, bedspreads and pillows during 2007. (Document No. 64-1, p. 3). To support his claim, Plaintiff cites Section 3.16 of the License Agreement:

> **Minor Renovations.** Beginning three years after the Opening Date, we may issue a "Minor Renovation Notice" to you that will specify reasonable Facility upgrading and renovation requirements (a "Minor Renovation") to be commenced no sooner than 60 days after the notice is issued, having an aggregate cost for labor, FF&E[5] and materials estimated by us to be not more than the Minor Renovation Ceiling Amount.[6] You will perform the Minor Renovations as and when the Minor Renovation Notice requires. We will not issue a Minor Renovation Notice within three years after the date of a prior Minor Renovation Notice, or if the three most recent quality assurance inspection scores of the Facility averaged no more than 200 points and the most recent quality assurance inspection score for the Facility was not more than 225 points (or equivalent scores under a successor quality assurance scoring system we employ), when the Facility is otherwise eligible for a Minor Renovation.

Defendant responds by citing other sections of the License Agreement that require franchisees to comply with Days Inn standards in every area, even as those standards are revised. The cover page of the Punchlist states, "You may need to take additional actions to meet our Standards, or comply with law, or at our discretion if we modify our Standards or the condition of the Facility changes materially after the inspection date." (Document No. 55-2, p. 34). The License Agreement, Section 3.4, states, "You will clean, repair, replace, renovate, refurbish, paint, and redecorate the Facility and its FF&E as and when needed to comply with System Standards." "Systems Standards" are defined as "the standards for the participating in the System published in the System Standards Manual, including but not limited to Design Standards, FF&E Standards, Marks Standards, Operations Standards, Technology Standards and Maintenance Standards and any other standards, policies, rules and procedures we promulgate about System operation and usage." Document No. 55-2, p. 29. The License Agreement contains repeated references to "Standards" and

---

[5] FF&E means furniture, fixtures and equipment.

[6] Minor Renovation Ceiling Amount is $3,000.00 per guest room, which works out to a total of over $400,000.00.

"the System,"[7] and the discretion and frequency with which Defendant may change and revise its standards. The primary benefit to a franchisee of any franchise arrangement is brand recognition and customer confidence in the level of quality and service associated with that brand. The primary burden is the obligation to pay the franchise fees and operate under a franchise agreement that conforms with the franchisor's standardized practices and business formula. In this case, the "Minor Renovations" in the License Agreement section cited by Plaintiff does operate to limit the extent of renovations that can be required of a franchisee during the first three years of the contract. However, it does not, as Plaintiff asserts in his Complaint, "specifically prohibits Days Inn Worldwide from requiring any renovations not specified on the punchlist for the first three years of operation..." (Document No. 1, ¶ 28). The purpose of new mattresses, box springs and pillows challenged by Plaintiff as improper easily fit into the categories of "replace, renovate, refurbish, paint, and redecorate" listed in Section 3.4 of the Agreement.

When contractual language is clear and unambiguous, it falls to the Court to employ common sense to analyze its meaning. "The polestar of contract construction is to discover the intention of the parties as revealed by the language used by them." Karl's Sales & Serv. v. Gimbel Bros., 592 A.2d 647, 650 (N.J. Super. A.D. 1991). Based on the terms of the License Agreement, the Court is convinced that Days Inn was clear and forthright about the likelihood that the franchisees could and would likely be required to make design and furnishing upgrades, such as bigger mattresses, at any time during the course of the Agreement's term. Consequently, the Court recommends that summary judgment be GRANTED in Defendant's favor on Count 5 of the Complaint.

---

[7] The License Agreement states, "We will control and establish requirements for all aspects of the System. We may, in our discretion, change, delete from or add to the System, including any of the Marks or System Standards, in response to changing market conditions." Document No. 55-2, p. 9.

### The Counterclaims

Defendant has brought seven counterclaims against Plaintiff, alleging that Plaintiff defaulted on the License Agreement by failing to pay agreed-upon franchise fees and by failing to return the telecommunications equipment when the License Agreement was terminated.

### Counterclaim I

In its first counterclaim, Defendant seeks the Court's authorization to conduct an audit of Plaintiff's financial information concerning the Hotel's gross room revenues during the period that the Hotel operated as a Days Inn. The License Agreement is clear in Section 3.8 that Defendant has a right to audit the Hotel's books and records. The Agreement states further that, "You acknowledge that your accurate accounting for and reporting of Gross Room Revenues is a material obligation you accept under this Agreement." Document No. 55-2, p. 5. Because the contractual language is clear and unambiguous, the Court recommends that summary judgment be GRANTED in Defendant's favor on Counterclaim I.

### Counterclaims II, III and IV

Counterclaim II is for breach of contract. Defendant alleges that Plaintiff owes it $113,179.03 in Recurring Fees that the Hotel accrued but failed to pay while operating as a Days Inn. In addition, Defendant alleges that Plaintiff owes $134,000.00 in liquidated damages, as a penalty for terminating the License Agreement before the end of its term. Counterclaim III alleges that Plaintiff's failure to pay these same amounts constitutes unjust enrichment, and Counterclaim IV seeks judgment on book account for the same recurring fees and liquidated damages.

It is undisputed that Plaintiff failed to make these payments and that they are required by the License Agreement. However, Plaintiff argues that at least a portion of these fees, such as the "GDS

Fee" and "Internet Booking Fee," covers the Hotel's use of the CRS – a benefit that Plaintiff did not enjoy for much of 2007. Consequently, Plaintiff argues that Defendant is not entitled to these fees. Moreover, if Defendant did indeed shut off the CRS during the disputed time period, then Defendant may have failed to perform its obligations under the License Agreement, and Plaintiff does not owe the Liquidated Damages. Plaintiff argues further that the amount of Liquidated Damages is unreasonable, and, therefore, unenforceable.

The Court has indicated earlier its determination that Defendant's provision of access to the CRS was a material item of the License Agreement, and Defendant's alleged failure to provide this service during the summer of 2007 may constitute a material breach of the Agreement which may excuse Plaintiff from further performance. Magnet Res., 723 A.2d at 981 ("Where a contract calls for a series of acts over a long term, a material breach may arise upon a single occurrence or consistent recurrences which tend to 'defeat the purpose of the contract.'") The issue of who owes how much to whom is not resolvable as a matter of law at this stage of the litigation. Consequently, the Court recommends that summary judgment on Counterclaims II, III and IV be DENIED.

**Counterclaims V, VI and VII**

Defendant's fifth counterclaim is for breach of contract, alleging that Plaintiff owes it $14,500.00 for the telecommunications equipment that Plaintiff retained for 29 weeks after the termination of the License Agreement and an additional $2,500.00 for early termination of the Satellite Connectivity Services Addendum. Counterclaim VI alleges that Plaintiff's retention of the telecommunications equipment constituted unjust enrichment, and Counterclaim VII asserts that Plaintiff owes Defendant the same amounts on a book account.

The schedule for these fees is set forth in paragraph 13 of the Satellite Connectivity Services Addendum, entered into by the parties on January 5, 2006, at the time of the execution of the License Agreement, which provides in Section 13(b): "If you fail or refuse to permit the peaceable entry to take possession of any Equipment, you will be liable for rental of the Equipment at the rate of Five Hundred Dollars ($500.00) per week from the date that we first attempt to retake it." Section 13(c) permits Defendant to charge Addendum Liquidated Damages of $2,500.00.

Defendant asserts that it first requested that Plaintiff permit it to recover the equipment on May 7, 2008, but that Plaintiff prevented it from recovering the equipment until November 26, 2008, a twenty-nine week period. Plaintiff has not disputed the facts as they are asserted by Defendant. Moreover, Plaintiff has not made any legal arguments on the subject of the telecommunications equipment. As a result, and because the language concerning the return of the telecommunication equipment is clear and unambiguous, the Court recommends that partial summary judgment be GRANTED in Defendant's favor on Counterclaims V, VI and VII, but only as to the rental fees in the amount of $14,500.00. The Liquidated Damages amount of $2,500.00 is factually intertwined with the issues relevant to Count IV and Counterclaims II, III and IV as to what constitutes a material breach of the License Agreement, which party committed the breach and when the breach was committed. Consequently, the Court recommends that summary judgment be DENIED on Counterclaims V, VI and VII as to the Liquidated Damages.

**Conclusion**

For the reasons set forth above, I recommend that Defendant's Motion for Summary Judgment (Document No. 53) on Plaintiff's Complaint (Document No. 1) be GRANTED as to Counts 1 and 5, but DENIED as to Count 4. Counts 2 and 3 have been abandoned by Plaintiff and,

therefore, I recommend that Defendant's Motion be GRANTED as to those Counts. In addition, I recommend that Defendant's Motion for Summary Judgment (Document No. 53) on its Second Amended Counterclaim (Document No. 42) be GRANTED as to Counterclaim I, but DENIED as to Counterclaims II, III, IV. Counterclaims V, VI, and VII, I recommend be GRANTED in part (the $14,500.00 rental fees), and DENIED in part (the $2,500.00 liquidated damages).

Any objection to this Report and Recommendation must be specific and must be filed with the Clerk of the Court within fourteen (14) days of its receipt. See Fed. R. Civ. P. 72(b); LR Cv 72. Failure to file specific objections in a timely manner constitutes waiver of the right to review by the District Court and the right to appeal the District Court's decision. See United States v. Valencia-Copete, 792 F.2d 4, 6 (1st Cir. 1986); Park Motor Mart, Inc., v. Ford Motor Co., 616 F.2d 603, 605 (1st. Cir. 1980).


  /s/ Lincoln D. Almond
LINCOLN D. ALMOND
United States Magistrate Judge
July 21, 2010